FILED

July 26, 2016

TN COURT OF
WORKERS' COMPENSATION
CLAIMS

Time 7:15 AM



**TENNESSEE BUREAU OF WORKERS' COMPENSATION
IN THE COURT OF WORKERS' COMPENSATION CLAIMS
AT KNOXVILLE**

| | |
|---|---|
| Tony Rucker,<br>　　　Employee,<br>v.<br>Flexible Staffing Solutions of Tennessee,<br>　　　Employer,<br>And<br>American Zurich Insurance Company,<br>　　　Carrier. | Docket No.: 2015-02-0126<br><br>State File No.: 71844-2014<br><br>Judge Pamela B. Johnson |

---

**EXPEDITED HEARING ORDER
FOR MEDICAL AND TEMPORARY DISABILITY BENEFITS**

---

This matter came before the undersigned Workers' Compensation Judge on the Renewed Motion to Compel Payment of Benefits filed by the Employee, Tony Rucker, on November 17, 2015, and in light of the Workers' Compensation Appeals Board's Decision Vacating in Part and Remanding the Trial Court's Compensation Order, entered May 13, 2016. The central legal issues are: (1) whether Mr. Rucker sustained an injury arising primarily out of and in the course and scope of his employment with the employer, Flexible Staffing Solutions of Tennessee; (2) whether Mr. Rucker is entitled to past or future temporary disability benefits, and if so, in what amount; and (3) whether Mr. Rucker is entitled to past or future medical benefits.[1] For the reasons set forth below, this Court finds Mr. Rucker provided sufficient evidence from which this Court concludes he is likely to prevail at a hearing on the merits on these issues. Accordingly, his motion to compel payment of temporary disability and medical benefits is granted.

*Procedural History*

Mr. Rucker filed a Petition for Benefit Determination (PBD) on May 13, 2015, seeking temporary disability and medical benefits. The parties did not resolve the disputed issues through mediation, and the Mediating Specialist filed a Dispute

---

[1] A complete listing of the technical record, stipulations, and exhibits admitted at the Compensation Hearing is attached to this Order as an appendix.

1

Certification Notice (DCN) on July 16, 2015. Mr. Rucker filed a Request for Initial Hearing on July 29, 2015, and this Court entered an Agreed Initial Hearing Order on September 21, 2015. As set forth in the Agreed Initial Hearing Order, the Court bifurcated the case and agreed to adjudicate the issue of compensability separately and prior to the adjudication of the issue of permanent disability benefits. Contemporaneous with the filing of Mr. Rucker's Pre Compensation Hearing Statement, he filed a Renewed Motion to Compel Payment of Benefits on November 17, 2015, seeking temporary disability and medical benefits.

This Court conducted an in-person, evidentiary Compensation Hearing on the issue of compensability on December 3, 2015. The Compensation Hearing Order was entered January 21, 2016. Flexible Staffing and its carrier filed a Compensation Hearing Notice of Appeal on February 19, 2016. The Workers' Compensation Appeals Board accepted the appeal and entered an Order Vacating in Part and Remanding in Part this Court's Compensation Hearing Order on May 13, 2016. The Appeals Board concluded: "the trial court erred in addressing the employee's entitlement to temporary disability and medical benefits in its order following the bifurcated compensation hearing, and we vacate that part of the trial court's compensation order." *Rucker v. Flexible Staffing Solutions of Tennessee, et al.,* No. 2015-02-0126, 2016 TN Wrk. Comp. App. Bd. LEXIS 23, at *1 (Tenn. Workers' Comp. App. Bd. May 13, 2016). The Appeals Board further found that the remaining issues in the employer's appeal were premature, dismissed the appeal, and remanded the case for such proceedings as necessary to resolve the outstanding issues. *Id.*

In light of the Appeals Board's ruling, this Court scheduled a Status Conference with the parties on June 2, 2016, to discuss Mr. Rucker's pending Renewed Motion to Compel Payment of Benefits. As previously stated, the parties agreed to allow this Court to make a determination based upon a review of the file pursuant to Rule 0800-02-21.14(1) (2015) of the Tennessee Compilation Rules and Regulations. On June 28, 2016, the Court sent a Docketing Notice to the parties regarding the contents of the record before it and gave the parties until July 8, 2016, to voice any objection to the documents contained in the record and/or file a position statement. Neither party raised any objection to the documents contained in the record nor filed a position statement. Considering the positions of the parties, the applicable law, and all of the evidence submitted, the Court concludes it needs no additional information to determine whether Mr. Rucker is likely to prevail at a hearing on the merits.

## History of Claim

Based upon the evidence introduced during the December 3, 2015 evidentiary hearing and a review of the record, the Court finds as follows:

Mr. Rucker is a forty-eight-year-old resident of Campbell County, Tennessee.

2

Flexible Staffing employed Mr. Rucker as a laborer and assigned him to work at Eagle Bend Manufacturing as an assembler. Prior to his employment at Flexible Staffing, Mr. Rucker worked as a highway maintenance laborer, security officer, police officer, and trained as an electrician and welder.

At 3:15 a.m. on September 2, 2015, while working for Flexible Staffing at Eagle Bend, Mr. Rucker pulled a part off the machine he operated when the right side of the part hung up. Mr. Rucker testified, "My neck went back and popped and shot sharp pains through my right shoulder." He reported the work incident to Sanford Miller, who is the Third Shift Supervisor employed by Eagle Bend. Mr. Miller transported Mr. Rucker to Occupational Health Systems (OHS) in Clinton, Tennessee for evaluation. Neither Flexible Staffing nor Eagle Bend provided Mr. Rucker a panel of physicians to select an authorized treating physician (ATP).

On that day, Mr. Rucker saw Ronald Flowers, a Physician's Assistant (PA) at OHS. (Ex. 3A.) Mr. Rucker complained of "pain in the right side of his neck" with "tingling and numbness in both hands, extending down into his fingers." *Id.* PA Flowers diagnosed osteoarthritis, degenerative disc disease, and sprain. *Id.* OHS staff sent Mr. Rucker home and instructed him to return later the same day.[2] PA Flowers and Dr. John McElligott, an OHS physician, signed the September 2, 2015 medical note.[3]

Mr. Rucker returned as instructed and reported: "overall, he was not improved." *Id.* OHS recommended six physical therapy visits. Only Dr. McElligott signed the later September 2, 2015 medical note.

Mr. Rucker completed six PT visits at OHS. After his sixth visit, Mr. Rucker returned to OHS on September 15, 2014, and continued to complain of pain in his lower neck and tingling and numbness in both arms, extending into both hands and fingertips. *Id.* The September 15, 2014 medical note provided:

> After review of the mechanism of injury [(MOI)] and/or lack thereof on all diagnoses listed for this evaluation now or related to this evaluation, I do

---

[2] The September 2, 2015 medical note stated, "The patient is scheduled for a return visit[.] This patient is working the 10pm to 6am shift, and was seen at 5am, he will need to be rechecked prior to his shift at 10pm tonight to determine his functional capabilities. This will require two visits on the same day." (Ex. 3A.)

[3] The September 2, 2015 medical note provided:

> The Designated Physician for this case is John McElligott, MD. This doctor has been assigned supervision of this case. The designated physician is physically present in the office during the evaluation and treatment of the employee. Team Based Medicine means that when patients are seen by Ron Flowers, PA-C, all findings including diagnostics are discussed with the designated physician while the employee/patient is still in the office. In addition, all treatment records are reviewed by the senior medical director regardless if seen by an MD or PA-C. After-hours cases seen by the PA-C are to be seen at the opening of the clinic ASAP that same day or the next working day. All Charts are E-signed by team members and medical director.

(Ex. 3A.)

not feel that this injury/exposure is Work related [sic]. See TN WC Law effective July 1, 2014, TN 50-6-102 (13). Pre-existing conditions are very likely or the MOI is not substantial to produce the present findings or lack of findings.

*Id.* OHS released Mr. Rucker from care without restrictions. *Id.* Both PA Flowers and Dr. McElligott signed the September 15, 2014 medical note.[4]

Dr. McElligott completed a Standard Form Medical Report and noted that Mr. Rucker "was pulling a part from his machine when he felt a pop in his neck, accompanied by pain in the neck." *Id.* at 1. In the Standard Form Medical Report, Dr. McElligott denied Mr. Rucker suffered any temporary total disability because of the work injury and further opined Mr. Rucker reached maximum medical improvement on September 15, 2014. *Id.* at 4. Considering Mr. Rucker's medical history, diagnosis and treatment, and all other available information regarding the onset and causes of his injury, Dr. McElligott further denied that it is more likely than not, as opposed to speculation or possibility, that Mr. Rucker's injury arose primarily out of and in the course and scope of his employment. *Id.* Dr. McElligott assigned no permanent medical impairment attributable to Mr. Rucker's work injury. *Id.*

During the evidentiary hearing, Mr. Rucker testified he never saw a doctor at OHS, denying that Dr. John McElligott ever examined or treated him. Mr. Rucker further denied OHS ordered an MRI or other diagnostic testing. Mr. Rucker admitted he was satisfied with his treatment at OHS, with the exception of painful physical therapy. Though he did not advise Flexible Staffing of any dissatisfaction with the care received at OHS, he advised Leslie Crawford at Flexible Staffing that the physical therapist was "hurting me more than they're helping me." Mr. Rucker did not ask Flexible Staffing to send him to another doctor and did not complain that his care at OHS was insufficient or inappropriate.

While undergoing physical therapy, Flexible Staffing offered Mr. Rucker alternative employment at the same rate of pay, which he performed by answering phones in the office. After his last visit of physical therapy, Flexible Spending advised Mr. Rucker that Eagle Bend did not require his services, and Flexible Staffing did not offer

---

[4] The September 15, 2015 medical note provided:

> The Designated Physician for this case is John McElligott, MD. This doctor has been assigned supervision of this case. The designated physician is physically present in the office during the evaluation and treatment of the employee. Team Based Medicine means that when patients are seen by Ron Flowers, PA-C, all findings including diagnostics are discussed with the designated physician while the employee/patient is still in the office. In addition, all treatment records are reviewed by the senior medical director regardless if seen by an MD or PA-C. After-hours cases seen by the PA-C are to be seen at the opening of the clinic ASAP that same day or the next working day. All Charts are E-signed by team members and medical director.

(Ex. 3A.)

4

Mr. Rucker further employment. Shortly thereafter, Flexible Staffing denied the claim and did not offer further medical treatment.

Mr. Rucker later attempted to work two days at Sears but could not tolerate the physical job requirements. Mr. Rucker filed for unemployment benefits in October 2014. The state denied his claim for unemployment benefits.

Subsequently, Mr. Rucker sought unauthorized medical care from neurosurgeon, Dr. Richard Boyer, on November 18, 2014. (Ex. 1A, November 18, 2014 Office Note.) Mr. Rucker did not ask Flexible Staffing to approve his initial visit with Dr. Boyer and did not advise Flexible Staffing that he received treatment with Dr. Boyer.

During the initial visit, Mr. Rucker advised Dr. Boyer he worked on a machine at Eagle Bend and reached to remove a part. Mr. Rucker described pain in the right side of his neck radiating to the anterior right shoulder with some paresthesias and tingling in the back of the head into both arms and down to his hands and fingers diffusely. Dr. Boyer ordered an MRI and injections. Dr. Boyer ultimately performed a three-level decompression and fusion at C4 through C7 on April 22, 2015, for the post-operative diagnoses of cervical spondylosis and C6-7 herniated nucleus pulposus. (Ex. 1A, Operative Note.).

Post-operatively, on May 21, 2015, Mr. Rucker reported continued numbness and tingling in the right arm, extending from the second and third fingers up the arm and into the elbow. On June 30, 2015, Mr. Rucker advised Dr. Boyer's office that "he was eating a few weeks ago and felt a severe pop in the back of his neck, in the lower portion of his neck and ever since then he started having a burning sensation into his right axilla area which is a new complaint." On September 3, 2015, Dr. Boyer's office referred Mr. Rucker to an orthopedic physician for evaluation of his right shoulder.

Dr. Boyer testified by deposition that he did not "explore with Mr. Rucker any other causes or potential causes for the neck pain that he was experiencing besides this injury that he reported." (Ex. 1 at 24.) Further, Dr. Boyer agreed he did not explore at any time with Mr. Rucker the mechanics of his injury or any details regarding the alleged accident. (Ex. 1 at 57.) When asked if he could state within a reasonable degree of medical certainty that Mr. Rucker's neck injury occurred on September 2, 2014, Dr. Boyer testified, "All I can say is that that's the history that he gave us that that's when the pain began and the events that happened that started the pain off." *Id.* Dr. Boyer further stated:

Q. Doctor, did you see anything clinically with Mr. Rucker that led you to believe that the surgery that you performed was primarily related to the September 2 accident?

A. Well, again, it's based on his report that that's when the injury began.

Q. But my question was, did you see anything clinically that led you to believe that September 2 was the date of the injury, or that you were treating him for injuries that occurred on September 2?

A. I think it's impossible to say that otherwise. If he had said the accident had been you know, August 31st, I would say that it started August 31st. There's nothing about the exam or his story otherwise that would be specific to one date.

Q. And by the same token, there's nothing that indicates that it did or did not occur on September 2, other than the history that he provided?

A. That's correct.

Q. Are there multiple other causes – excuse me, let me back up. Are there other causes of neck pain and herniation besides trauma?

A. Sure. There are people who have no trauma at all and have pain. And there are patients who have, as I said, no herniation and have an event that starts off the symptoms. So it's difficult outside of the description of the history to give causation.

(Ex. 1 at 58-59.)

Dr. Boyer testified further:

Q. And considering Mr. Rucker's history; the diagnosis that you made; the treatment that you rendered, including all the injections, and all other available information regarding the onset and the cause of his neck problems, you agree that its more likely than not that Mr. Rucker's injury arises primarily out of and in the course of his employment with respect to that herniated disk and the surgery you performed? Would you agree with that?

[Objection omitted.][5]

A. Well, I think that history seems to be consistent with that. And as that being the onset of the pain, the disk herniation we found at C6-7, as I've

---

[5] The parties stipulated to the admissibility of Dr. Boyer's deposition transcript without asking the Court to rule on objections raised during the deposition. Accordingly, the Court omitted the objection raised to the testimony and the discussion of counsel.

testified, it could be traumatic. But all those things, I think, you know, go along or are consistent with how he described it. But it's based on his report of history, yes.

Q. Thank you. Now, in addition to that, and if we assume that then is true, then the medical treatment, the surgery you did, the hospitalization, and your referral to Dr. Casey, you would agree were reasonable and necessary and incidental as a result of that particular injury that occurred that's also documented by Nurse Caldwell in his notes, September 2, 2014? Would you agree with that?

[Objection omitted.]

A. Yes, I think that's reasonable to say.

. . .

Q. Doctor, are the charges totally summarized and everything there [Exhibit 1C – Itemization of Bill] would be incidental to this injury as we previously described, reasonable and necessary, as a result of the injury for which you treated him; is that true?

[Objection omitted.]

A. I believe so, yes.

. . .

Q. And those charges [surgery performed at University of Tennessee Medical Center] would have been reasonable and necessary and incidental as a result of the treatment that was rendered as a result of the injury as well, correct?

[Objection omitted.]

A. I believe so.

(Ex. 1 at 70-71, 73.)

During his deposition, Dr. Boyer testified that Mr. Rucker had not reached maximum medical impairment. (Ex. 1 at 56.) Dr. Boyer additionally affirmed during his deposition that, from the date of his termination on September 15, 2014, to the present, Mr. Rucker "was totally unable to return to the job at Eagle Bend if it required him to engage in heavy work and repetitive work on a daily basis." (Ex. 1 at 75-76.) Dr. Boyer further agreed that Mr. Rucker was capable of performing light, sedentary-type work during the same timeframe. (Ex. 1 at 76.)

7

Mr. Rucker also received unauthorized care from orthopedic surgeon, Dr. Michael Casey, who treated him for his right-shoulder complaints. Dr. Casey performed surgery on Mr. Rucker's right shoulder. Dr. Casey's medical records were not introduced into evidence.

In the interim, Mr. Rucker underwent an independent medical examination with Dr. C.M. Salekin on April 18, 2015, and complained of "neck pain with intermittent radiation to the right hand following an injury at work on 9-2-14." (Ex. 2A, April 18, 2015 Medical Note.) Dr. Salekin diagnosed "[m]ultiple cervical radiculopathies involving right C5, C6, C7 nerve roots caused by injury at work on 9-2-14 with ongoing pain in the neck and weakness of multiple muscle groups on the right upper extremity." *Id.* In his April 18, 2015 Standard Form Medical Report and considering Mr. Rucker's medical history, diagnosis and treatment, and all other available information regarding the onset and causes of his injury, Dr. Salekin responded affirmatively it is more likely than not, as opposed to speculation or possibility, that Mr. Rucker's injury arose primarily out of and in the course and scope of his employment. (Ex. 2A.)

Mr. Rucker returned to see Dr. Salekin on August 29, 2015, for a follow-up independent medical examination. (Ex. 2B.) Dr. Salekin diagnosed (1) "[l]eft C4 radiculopathy due to disc protrusion at C3-C4 level caused by the injury at work on 9-2-14 with residual signs and symptoms," and (2) "[m]ultiple cervical radiculopathies caused by the injury at work on 9-2-14 involving right C5, C6, and C7 nerve roots status post fusion with residual signs and symptoms." (Ex. 2B, August 29, 2015 Medical Note.) In his August 29, 2015 Standard Form Medical Report and considering Mr. Rucker's medical history, diagnosis and treatment, and all other available information regarding the onset and causes of his injury, Dr. Salekin responded affirmatively it is more likely than not, as opposed to speculation or possibility, that Mr. Rucker's injury arose primarily out of and in the course and scope of his employment. (Ex. 2B.) Dr. Salekin further opined that Mr. Rucker suffered temporary total disability, beginning September 2, 2014, and assigned restrictions. *Id.* He placed Mr. Rucker at maximum medical improvement on August 29, 2015. *Id.*

By deposition, Dr. Salekin testified:

Q. Have you considered anything at all about the shoulder to date?

[Objection omitted.][6]

A.     I think the new finding on the shoulder that he has not achieved

---

[6] The parties stipulated to the admissibility of Dr. Salekin's deposition transcript without asking the Court to rule on objections raised during the deposition. Accordingly, the Court omitted the objection raised to the testimony and the discussion of counsel.

maximum medical improvement, because I believe the shoulder injury is also sustained by the same event which caused the neck injury. And the reason for the delay in diagnosis of the shoulder injury is because – even for an expert neurosurgeon or orthopaedic surgeon, it is difficult to differentiate between C5 radiculopathy from [a] shoulder problem. Because pain from the neck due to C5 radiculopathy also radiates to the shoulder where the C5 dermatome is located, slightly below and around the shoulder.

(Ex. 2 at 60-61.)

During the December 3, 2015 evidentiary hearing, Mr. Rucker asserted he sustained an injury to his neck and right shoulder arising primarily out of and in the course and scope of his employment with Flexible Staffing. Dr. Boyer and Dr. Salekin opined that it is more likely than not, as opposed to speculation or possibility, that Mr. Rucker's injury arose primarily out of and in the course and scope of his employment. While Dr. McElligott disagrees, his opinion is not entitled to a presumption of correctness because he was not chosen from a panel of physicians. Flexible Staffing did not give Mr. Rucker a panel of physicians from which he could select an authorized treating physician. Moreover, he argued Dr. McElligott's opinion should be afforded little to no weight because he did not physically evaluate or treat Mr. Rucker. Instead, he merely reviewed the findings and records of PA Flowers. Additionally, Mr. Rucker argued he was not required to report to Flexible Staffing his dissatisfaction with OHS' treatment or advise of his treatment with Dr. Boyer and Dr. Casey because Flexible Staffing denied his claim.

Flexible Staffing countered Mr. Rucker failed to demonstrate by a preponderance of the evidence that his employment contributed more than fifty percent in causing the injury, considering all causes. Specifically, Flexible Staffing averred that Dr. Boyer made no inquiry into, or explored other causes of, Mr. Rucker's injury. Additionally, Dr. Boyer never testified the September 2, 2014 work incident was the primary cause of Mr. Rucker's injury. Flexible Staffing further averred Dr. Salekin conceded it was difficult to determine the cause of Mr. Rucker's injury and relied in great part upon the history provided by Mr. Rucker.

Flexible Staffing asserted Mr. Rucker's testimony is not credible and insufficient to establish the necessary elements to entitle him to workers' compensation benefits. Dr. McElligott confirmed in his Standard Medical Report he saw Mr. Rucker. Additionally, Dr. McElligott's signature was the only signature on the second visit conducted on September 2, 2014, evidencing that he physically examined Mr. Rucker that day. Dr. McElligott, who Flexible Staffing claimed is the authorized treating physician, opined Mr. Rucker's injury was not caused by the September 2, 2014 work incident. Moreover, Mr. Rucker did not offer any medical opinion, from Dr. Casey or otherwise, that his

9

right-shoulder injury was compensable.

## Findings of Fact and Conclusions of Law

Mr. Rucker bears the burden of proof on all essential elements of his workers' compensation claim. *Scott v. Integrity Staffing Solutions,* No. 2015-01-0055, 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Tenn. Workers' Comp. App. Bd. Aug. 18, 2015). Mr. Rucker need not prove every element of his claim by a preponderance of the evidence in order to obtain relief at an Expedited Hearing. *McCord v. Advantage Human Resourcing*, No. 2014-06-0063, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *7-8, 9 (Tenn. Workers' Comp. App. Bd. Mar. 27, 2015). At an Expedited Hearing, Mr. Rucker has the burden to come forward with sufficient evidence from which the trial court can determine that he is likely to prevail at a hearing on the merits. *Id.*

*Mr. Rucker demonstrated he is likely to prevail at a hearing on the merits on the issue of whether he sustained an injury arising primarily out of and in the course and scope of his employment with the employer, Flexible Staffing Solutions of Tennessee.*

With the above principles in mind, an injury must arise primarily out of and occur in the course and scope of the employment to be compensable under the Workers' Compensation Law. *McCaffery v. Cardinal Logistics*, No. 2015-08-0218, 2015 TN Wrk. Comp. App. Bd. LEXIS 50, at *8-9 (Tenn. Workers' Comp. App. Bd. Dec. 10, 2015); *see also* Tenn. Code Ann. § 50-6-102(14) (2015). The term "injury" is defined as "an injury by accident . . . arising primarily out of and in the course and scope of employment, that causes death, disablement or the need for medical treatment of the employee." *Id.* For an injury to be accidental, it must be "caused by a specific incident, or set of incidents, arising primarily out of and in the course and scope of employment, and is identifiable by time and place of occurrence." Tenn. Code Ann. § 50-6-102(14)(A) (2015).

In the present case, Mr. Rucker testified that, on September 2, 2014, while working for Flexible Staffing at Eagle Bend, he pulled a part off the machine he operated when the right side of the part hung up. He then testified, "My neck went back and popped and shot sharp pains through my right shoulder." This Court finds Mr. Rucker to be credible. The Court concludes that Mr. Rucker established that he sustained an injury to his neck "caused by a specific incident, or set of incidents," and "identifiable by time and place of occurrence."

The issue therefore turns to whether Mr. Rucker demonstrated he is likely to prevail at a hearing on the merits on the issue of whether his September 2, 2014 neck injury arose primarily out of and in the course and scope of his employment. An injury "arises primarily out of and in the course and scope of employment" only if it has been shown by a preponderance of the evidence that the employment contributed more than fifty percent in causing the injury, considering all causes. Tenn. Code Ann. § 50-6-

102(14)(B) (2015).  An injury causes death, disablement, or the need for medical treatment only if it has been shown to a reasonable degree of medical certainty that it contributed more than fifty percent in causing the death, disablement, or need for medical treatment, considering all causes.  Tenn. Code Ann. § 50-6-102(14)(C) (2015).  "Shown to a reasonable degree of medical certainty" means that, in the opinion of the physician, it is more likely than not considering all causes, as opposed to speculation or possibility.  Tenn. Code Ann. § 50-6-102(14)(E) (2015).  The opinion of the treating physician, selected by the employee from the employer's designated panel of physicians, shall be presumed correct on the issue of causation, but the presumption is rebuttable by a preponderance of the evidence. *Id.*

Here, Flexible Staffing did not provide Mr. Rucker a panel of physicians.  As such, Dr. McElligott's opinion is not entitled to a presumption of correctness on the issue of causation.  Accordingly, this Court must weigh the opinions of the three medical experts.  A trial court generally has the discretion to choose which expert to accredit when there is a conflict of expert opinions. *Brees v. Escape Day Spa & Salon,* No. 2014-06-0072, 2015 TN Wrk. Comp. App. Bd. LEXIS 5, at *14 (Tenn. Workers' Comp. App. Bd. Mar. 12, 2015) (citing *Kellerman v. Food Lion, Inc.,* 929 S.W.2d 333, 335 (Tenn. 1996); *Johnson v. Midwesco, Inc.,* 801 S.W.2d 804, 806 (Tenn. 1990)).  In evaluating conflicting expert testimony, a trial court may consider, among other things, "the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information through other experts." *Id.* (citing *Orman v. Williams Sonoma, Inc.,* 803 S.W.2d 672, 676 (Tenn. 1991)).

Dr. McElligott and medical providers at OHS first evaluated Mr. Rucker.  OHS medical providers obtained a history, performed a physical examination, and ordered x-rays of the cervical spine and six visits of physical therapy.  Dr. McElligott, a board-certified internist, denied that it was "more likely than not, as opposed to speculation or possibility, that Mr. Rucker's injury arose primarily out of and in the course and scope of his employment." (Ex. 3.) Mr. Rucker argued that this Court should give little weight to Dr. McElligott's opinion because he never physically examined or treated Mr. Rucker.  Flexible Staffing asserted that Dr. McElligott physically examined and treated Mr. Rucker on at least one occasion, if not more, as evidenced by the second September 2, 2014 office visit and the Standard Medical Report he completed.  The parties did not offer into evidence Dr. McElligott's testimony.

Dr. Boyer, board-certified in neurological surgery, began treating Mr. Rucker in November 2014.  Dr. Boyer obtained a history, conducted a physical examination, and ordered injections and diagnostic testing including: cervical spine MRI scans (December 4, 2014, and July 27, 2015), a Nerve Conduction Study (EMG/NCV) (June 26, 2015), a cervical spine CT scan (September 3, 2015), and periodic x-rays.  Dr. Boyer performed C4-C7 discectomy, osteophytectomy, and fusion on April 22, 2015, for cervical

11

spondylosis and C6-7 herniated nucleus pulposus. Dr. Boyer continues to treat Mr. Rucker. Dr. Boyer testified by deposition and opined, based upon Mr. Rucker's history, it is more likely that not that Mr. Rucker's neck injury arose primarily out of and in the course of his employment. (Ex. 1 at 70-71.)

Dr. Salekin, a board-certified neurologist, examined Mr. Rucker on two separate occasions, once before and once after his neck fusion. Dr. Salekin reviewed and summarized the findings of the x-rays, MRI scans, EMG/NCV, and operative report. Dr. Salekin completed a Standard Medical Report following each examination and testified by deposition. Dr. Salekin opined, "[C]onsidering Mr. Rucker's medical history, diagnosis and treatment, and all other available information regarding the onset and causes of his injury," "it is more likely than not, as opposed to speculation or possibility, that Mr. Rucker's injury arose primarily out of and in the course and scope of his employment." (Ex. 2B.)

In assigning weight to the medical opinions in this case, the Court gives greater weight to the physicians having the most contact with Mr. Rucker. This Court finds Dr. Boyer's testimony most persuasive. Flexible Staffing averred Dr. Boyer's testimony failed to establish the necessary causal relationship between Mr. Rucker's employment and his injury, because he denied considering other causes. This Court disagrees. A close reading of Dr. Boyer's testimony reflects that Dr. Boyer only denied exploring *with* Mr. Rucker other causes or potential causes. (Ex. 1 at 24, 59.) Dr. Boyer was not asked whether he independently considered other causes or potential causes. Moreover, the record reflects that Dr. Boyer, in fact, considered other causes or potential causes as evidenced by the numerous diagnostic tests ordered. Specifically, Dr. Boyer testified at length to the degenerative disc disease noted on the diagnostic test results. Dr. Boyer opined that diagnoses were consistent with the September 2, 2014 work incident and injury Mr. Rucker described.

Ultimately, Dr. Boyer opined that, based upon Mr. Rucker's history, it was more likely than not that Mr. Rucker's neck injury arose primarily out of and in the course of his employment. (Ex. 1 at 70-71.) Dr. Salekin's opinion on causation supports Dr. Boyer's conclusion as to the neck injury and establishes causation as to the right-shoulder injury. (Ex. 2.) This Court gives little weight to Dr. McElligott's opinion on causation based upon his limited, or non-existent, physical examination of Mr. Rucker and the meager diagnostic test results underlying his opinion.

After careful consideration of the records as a whole, this Court concludes that Mr. Rucker demonstrated that he is likely to prevail at a hearing on the merits on the issue of whether his September 2, 2014 injuries to his neck and right shoulder arose primarily out of and in the course or scope of his employment with Flexible Staffing.

12

*Mr. Rucker demonstrated that he is likely to prevail at a hearing on the merits on the issue of entitlement to medical benefits.*

This Court now turns to the issue of Mr. Rucker's entitlement to medical benefits. Under Workers' Compensation Law, "the employer or the employer's agent shall furnish, free of charge to the employee, such medical and surgical treatment . . . made reasonably necessary by accident[.]" Tenn. Code Ann. § 50-6-204(a)(1)(A) (2015). "The injured employee shall accept the medical benefits. . . provided that in any case when the employee has suffered an injury and expressed a need for medical care, the employer shall designate a group of three (3) or more independent reputable physicians. . . from which the employee shall select one (1) to be the treating physician." Tenn. Code Ann. § 50-6-204(a)(3)(A)(i) (2015).

However, "an employer who elects to deny a claim runs the risk that it will be held responsible for medical benefits obtained from a medical provider of the employee's choice and/or that it may be subject to penalties for failure to provide a panel of physicians and/or benefits in a timely manner." *McCord v. Advantage Human Resourcing*, No. 2014-06-0063, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *13 (Tenn. Workers' Comp. App. Bd. Mar. 27, 2015); *see also Bond v. Am. Air Filter*, 692 S.W.2d 638 (Tenn. 1985). Moreover, when an employer initially fails to provide a panel of physicians from which an employee might choose a treating physician, the employer cannot belatedly seek to control selection of the treating physician by the late provision of a panel. *Lambert v. Famous Hospitality, Inc.*, 947 S.W.2d 852, 854 (Tenn. 1997).

In this case, Flexible Staffing did not offer Mr. Rucker a panel of physicians from which he could select an authorized treating physician, but it authorized and paid for his treatment at OHS. Flexible Staffing later denied Mr. Rucker's claim and did not offer further medical treatment. Thereafter, Mr. Rucker sought medical care on his own with Dr. Boyer and Dr. Casey. This Court concludes Mr. Rucker demonstrated he is likely to prevail at a hearing on the merits on the issue of entitlement to medical benefits. Therefore, he is entitled to medical treatment made necessary by his September 2, 2014 injuries to his neck and right shoulder, in accordance with Tennessee Code Annotated section 50-6-204 (2015). Flexible Staffing shall pay for Mr. Rucker's past medical expenses incurred and made reasonably necessary by the September 2, 2014 neck injury. Dr. Boyer shall be the authorized treating physician for the neck injury.

The parties presented this Court with no evidence from which it might conclude the medical expenses incurred for the right shoulder were made reasonably necessary by the September 2, 2014 injury. Accordingly, this Court reserves the issue of past medical expenses for the right shoulder to be determined at a later date. Based upon the referral of Dr. Boyer, and in accordance with Tennessee Code Annotated section 50-6-204(a)(3)(A)(ii) (2015), Dr. Casey shall be the authorized treating physician for the right-shoulder injury.

13

*Mr. Rucker demonstrated that he is likely to prevail at a hearing on the merits on the issue of entitlement to temporary disability benefits.*

The next issue this Court must consider is Mr. Rucker's eligibility for temporary disability benefits. An injured worker is eligible for temporary disability benefits if: (1) the worker became disabled from working due to a compensable injury; (2) there is a causal connection between the injury and the inability to work; and (3) the worker established the duration of the period of disability. *Jones v. Crencor Leasing and Sales*, No. 2015-06-0332, 2015 TN Wrk. Comp. App. Bd. LEXIS 48, at *7 (Tenn. Workers' Comp. App. Bd. Dec. 11, 2015) (citing *Simpson v. Satterfield*, 564 S.W.2d 953, 955 (Tenn. 1978)). Temporary total disability benefits are terminated either by the ability to return to work or attainment of maximum recovery. *Id.*

Temporary partial disability benefits, a category of vocational disability distinct from temporary total disability, is available when the temporary disability is not total. *Id.; see also* Tenn. Code Ann. § 50-6-207(1)-(2) (2015). Specifically, "[t]emporary partial disability refers to the time, if any, during which the injured employee is able to resume some gainful employment but has not reached maximum recovery." *Id.* (citing *Williams v. Saturn Corp.*, No. M2004-01215-WC-R3-CV, 2005 Tenn. LEXIS 1032, at *6 (Tenn. Workers' Comp. Panel Nov. 15, 2005)). Thus, in circumstances where the treating physician has released the injured worker to return to work with restrictions prior to maximum medical improvement, and the employer either (1) cannot return the employee to work within the restrictions or (2) cannot provide restricted work for a sufficient number of hours and/or at a rate of pay equal to or greater than the employee's average weekly wage on the date of injury, the injured worker may be eligible for temporary partial disability. *Id.*

Here, Mr. Rucker testified that immediately following the September 2, 2014 work injury, Flexible Staffing offered him accommodated duty through September 15, 2014. After his last visit of physical therapy on September 15, 2014, Flexible Staffing advised Mr. Rucker that Eagle Bend did not require his services and Flexible Staffing did not offer Mr. Rucker further employment. With the exception of two days of work at Sears, Mr. Rucker testified that he did not work after Flexible Staffing advised him that Eagle Bend no longer required his services and did not offer him further work assignments.

In consideration of Dr. Boyer's and Dr. Salekin's opinions as to Mr. Rucker's ability to work only restricted duty following his September 2, 2014 work injury to the present, this Court concludes Mr. Rucker demonstrated he is likely to prevail at a hearing on the merits regarding entitlement to temporary disability benefits. Therefore, he is entitled to temporary partial disability benefits. Flexible Staffing shall pay Mr. Rucker temporary partial disability benefits from September 16, 2014, to the present, taking into consideration the two days of employment at Sears during this period. Flexible Staffing

14

shall continue to pay Mr. Rucker temporary disability benefits in accordance with Tennessee Code Annotated section 50-6-207 (2015).

**IT IS, THEREFORE, ORDERED** as follows:

1. Mr. Rucker shall receive medical treatment made reasonably necessary by the September 2, 2014 injury and in accordance with Tennessee Code Annotated section 50-6-204 (2015). Flexible Staffing shall pay Mr. Rucker's past medical expenses incurred and made reasonably necessary by the September 2, 2014 neck injury. Dr. Boyer shall be the authorized treating physician for the neck injury.

2. This Court reserves the issue of past medical expenses for the right shoulder. Dr. Casey shall be the authorized treating physician for the right-shoulder injury.

3. The amount of temporary disability benefit is $267.45 per week based on Mr. Rucker's average weekly wage of $401.17.

4. Flexible Staffing shall pay Mr. Rucker temporary partial disability benefits from September 16, 2014, to the present, with the exception of the two days of employment at Sears during this period.

5. Flexible Staffing shall continue to pay Mr. Rucker temporary disability benefits in accordance with Tennessee Code Annotated section 50-6-207 (2015).

6. This matter is set for a Status Conference on **September 28, 2016**, at **1:30 p.m.** The parties must call 865-594-0091or 855-543-5041 toll free to participate in the Initial Hearing. Failure to appear by telephone may result in a determination of the issues without your further participation.

7. Unless interlocutory appeal of the Expedited Hearing Order is filed, compliance with this Order must occur no later than seven business days from the date of entry of this Order as required by Tennessee Code Annotated section 50-6-239(d)(3) (2015). The Insurer or Self-Insured Employer must submit confirmation of compliance with this Order to the Bureau by email to WCCompliance.Program@tn.gov no later than the seventh business day after entry of this Order. Failure to submit the necessary confirmation within the period of compliance may result in a penalty assessment for non-compliance.

8. For questions regarding compliance, please contact the Workers' Compensation Compliance Unit by email at WCCompliance.Program@tn.gov or by telephone at (615) 253-1471 or (615) 532-1309.

**ENTERED** this the 26th day of July, 2016.

<br>

HON. PAMELA B. JOHNSON
Workers' Compensation Judge

Right to Appeal:

Tennessee Law allows any party who disagrees with this Expedited Hearing Order to appeal the decision to the Workers' Compensation Appeals Board. To file a Notice of Appeal, you must:

1. Complete the enclosed form entitled: "Expedited Hearing Notice of Appeal."

2. File the completed form with the Court Clerk *within seven business days* of the date the Workers' Compensation Judge entered the Expedited Hearing Order.

3. Serve a copy of the Expedited Hearing Notice of Appeal upon the opposing party.

4. The appealing party is responsible for payment of a filing fee in the amount of $75.00. Within ten calendar days after the filing of a notice of appeal, payment must be received by check, money order, or credit card payment. Payments can be made in person at any Bureau office or by United States mail, hand-delivery, or other delivery service. In the alternative, the appealing party may file an Affidavit of Indigency, on a form prescribed by the Bureau, seeking a waiver of the filing fee. The Affidavit of Indigency may be filed contemporaneously with the Notice of Appeal or must be filed within ten calendar days thereafter. The Appeals Board will consider the Affidavit of Indigency and issue an Order granting or denying the request for a waiver of the filing fee as soon thereafter as is practicable. Failure to timely pay the filing fee or file the Affidavit of Indigency in accordance with this section shall result in dismissal of the appeal.

5. The parties, having the responsibility of ensuring a complete record on appeal, may request, from the Court Clerk, the audio recording of the hearing for the purpose of having a transcript prepared by a licensed court reporter and filing it with the Court Clerk within ten calendar days of the filing of the Expedited Hearing Notice of Appeal. Alternatively, the parties may file a joint statement of the evidence within ten calendar days of the filing of the Expedited Hearing Notice of Appeal. The statement of the evidence must convey a complete and accurate account of what transpired in the Court of Workers' Compensation

16

Claims and must be approved by the workers' compensation judge before the record is submitted to the Clerk of the Appeals Board.

6. If the appellant elects to file a position statement in support of the interlocutory appeal, the appellant shall file such position statement with the Court Clerk within five business days of the expiration of the time to file a transcript or statement of the evidence, specifying the issues presented for review and including any argument in support thereof. A party opposing the appeal shall file a response, if any, with the Court Clerk within five business days of the filing of the appellant's position statement. All position statements pertaining to an appeal of an interlocutory order should include: (1) a statement summarizing the facts of the case from the evidence admitted during the expedited hearing; (2) a statement summarizing the disposition of the case as a result of the expedited hearing; (3) a statement of the issue(s) presented for review; and (4) an argument, citing appropriate statutes, case law, or other authority.

## APPENDIX

Technical Record:
1. Petition for Benefit Determination, filed May 13, 2015;
2. Dispute Certification Notice, filed July 16, 2015;
3. Mr. Rucker's Notice of Intent to Use Standard Form Medical Report in Lieu of Deposition of Dr. Salekin, filed July 29, 2015;
4. Mr. Rucker's Motion to Compel Payment of Benefits, filed July 29, 2015;
5. Request for Initial Hearing, filed July 29, 2015;
6. Flexible Staffing's Response in Opposition to Mr. Rucker's Motion to Compel Temporary Total Disability Benefits, filed August 3, 2015;
7. Order Dismissing Motion to Compel Payment of Benefits, entered August 25, 2015;
8. Mr. Rucker's Second Notice of Intent to Use Standard Form Medical Report in Lieu of Deposition of Dr. C.M. Salekin, filed September 8, 2015;
9. Flexible Staffing's Notice of Objection, filed September 10, 2015;
10. Initial Hearing Order, entered September 21, 2015;
11. Flexible Staffing's Notice of Intent to Use Standard Form Medical Report of Dr. John McElligott in Lieu of Deposition, filed November 16, 2015;
12. Mr. Rucker's Objection to Flexible Staffing's Use of Standard Medical Report in Lieu of Deposition of Dr. John McElligott, filed November 17, 2015;
13. Mr. Rucker's Renewed Motion to Compel Payment of Benefits, filed November 17, 2015;
14. Mr. Rucker's Pre Compensation Hearing Statement (unsigned), submitted November 17, 2015;
15. Parties' Pre-Bifurcated Compensability Only Hearing Statement (signed only by Flexible Staffing's attorney), filed November 25, 2015;

16. Compensation Hearing Order, entered January 21, 2016;
17. Order Correcting Compensation Hearing Order, entered January 28, 2016;
18. Compensation Hearing Condensed Transcript, filed March 4, 2016; and
19. Workers' Compensation Appeals Board Order, entered May 13, 2016.

The Court did not consider attachments to Technical Record filings unless admitted into evidence during the evidentiary. The Court considered factual statements in these filings or any attachments to them as allegations unless established by the evidence.

Stipulated Findings of Facts of the Parties:
- Mr. Rucker's alleged date of injury is September 2, 2014.
- Mr. Rucker gave notice of the alleged injury to Flexible Staffing on September 2, 2014.
- Mr. Rucker is forty-eight years old and a resident of Campbell County, Tennessee.
- Mr. Rucker completed the eleventh grade and obtained a GED.
- Mr. Rucker's average weekly wage is $401.17, which results in a workers' compensation rate of $267.45 per week.
- Mr. Rucker received authorized medical treatment with Occupational Health Systems for the injury of September 2, 2014.
- Flexible Staffing paid medical expenses to Occupational Health Systems only.
- According to Dr. Richard P. Boyer, Mr. Rucker has not reached maximum medical improvement.
- Mr. Rucker did not receive temporary disability benefits.
- Mr. Rucker has not returned to work for Flexible Staffing, earning the same or greater wage as he earned prior to the injury.

Stipulated Conclusions of Law of the Parties:
- This claim is governed by the Workers' Compensation Law for the state of Tennessee.
- An employment relationship existed between Mr. Rucker and Flexible Staffing.
- Mr. Rucker provided proper, statutory notice of the alleged injury to Flexible Staffing.
- Mr. Rucker filed the Petition for Benefit Determination within the applicable statute of limitations.

Exhibits:
- EXHIBIT 1: Deposition Transcript of Dr. Richard P. Boyer;
- EXHIBIT 1A: Medical Records of Dr. Richard P. Boyer;
- EXHIBIT 1B: Curriculum Vitae of Dr. Richard P. Boyer;
- EXHIBIT 1C: Medical Expenses for Dr. Richard P. Boyer;
- EXHIBIT 2: Deposition Transcript of Dr. C.M. Salekin;

- EXHIBIT 2A: Standard Form Medical Report, Form C32, of Dr. C.M. Salekin, dated April 18, 2015;
- EXHIBIT 2B: Standard Form Medical Report, Form C32, of Dr. C.M. Salekin, dated August 29, 2015;
- EXHIBIT 2C: Exhibits to Deposition of Dr. C.M. Salekin;
- EXHIBIT 3: Standard Form Medical Report, Form C32, of Dr. John McElligott;
- EXHIBIT 3A: Medical Records of Dr. John McElligott; and
- EXHIBIT 4: Tony Rucker's Personnel Records (numbered 0014-0031).

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Expedited Hearing Order was sent to the following recipients by the following methods of service on this the 26th day of July, 2016.

| Name | Certified Mail | Fax | Email | Service sent to: |
|---|---|---|---|---|
| David H. Dunaway, Esq., Employee's Attorney | | | X | dhdunaway@aol.com |
| Neil M. McIntire, Esq. Employer's Attorney | | | X | nmcintire@howell-fisher.com |

PENNY SHRUM, Court Clerk
WC.CourtClerk@tn.gov

19